IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 1:23-cr-00226-TJK |
| | ) | |
| v. | ) | |
| | ) | |
| QUINN KEEN, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

## INTRODUCTION

On July 12, 2023, the government obtained a ten-count indictment charging Quinn Keen with offenses on January 6, 2021, including: civil disorder, in violation of 18 U.S.C. §231(a)(3) (count one); assaulting, resisting or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (counts two, three, and four); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (count five); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (count six); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (count seven); disorderly conduct in a Capitol building, in violation 40 U.S.C. § 5104(e)(2)(D) (count eight); act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (count nine); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On February 20, 2024, Mr. Keen pled guilty to count three, that is, assaulting, resisting, or impeding certain officers, pursuant to a written plea agreement. The plea agreement calls for the government to move to dismiss the remaining counts at the time of sentencing. The plea agreement also has provisions for no further prosecution against Mr. Keen for conduct in the

statement of offense, to allow law enforcement agents to review any social media accounts Mr. Keen operated for related statements or postings, and for an interview of Mr. Keen regarding the events in and around January 6, 2021.

The presentence report drafter determined that Mr. Keen's base offense level under the advisory sentencing guidelines is 14. (PSR ¶33). Because a Metropolitan Police Officer was the victim of the offense, a six-level increase was applied under USSG § 3A1.2(b). (PSR ¶35). After applying a three-level reduction for acceptance of responsibility (PSR ¶¶39, 40), and calculating Mr. Keen's criminal history category as I (PSR ¶45), the presentence report drafter found a total offense level of 17 and an advisory sentencing guideline range of 24 to 30 months of imprisonment. (PSR ¶91). There are no advisory sentencing guideline calculations requiring resolution. The ultimate question is what sentence is "sufficient, but not greater than necessary" in this case, pursuant to the factors in 18 U.S.C. § 3553(a), and Mr. Keen respectfully argues that a probationary sentence is sufficient in this case.

## ARGUMENT

On January 6, 2021, Quinn Keen was part of a large crowd that gathered outside the Capitol during a joint session of Congress where the 2020 Presidential Election results were to be certified. (PSR ¶17). Mr. Keen had read about the "10 Days of Delegation" on the InfoWars website and had driven on his own from Illinois to Washington D.C. to attend former President Trump's rally and speech with the thought gleaned from the article that an inquiry into election fraud was going to be launched that would take ten days to complete. As a large crowd left the rally and went to the Capitol, Mr. Keen followed and joined the group, which encountered temporary and permanent barricades around the exterior of the Capitol building. (PSR ¶18). At around 2:00 p.m., some members of the crowd forced their way past barricades, and the crowd

2

advanced to the exterior façade of the Capitol. (PSR ¶19). Although members of the Capitol Police attempted to keep order and prevent entry into the Capitol, shortly after 2:00 p.m. individuals in the crowd forced entry by breaking windows and by assaulting members of law enforcement. (PSR ¶20). Other members of the crowd encouraged and assisted those acts, and rioters made their way into the Capitol, necessitating evacuation of both chambers of Congress and the Vice President and suspension of the joint session until the Capitol was secured that night. (PSR ¶21).

After joining the crowd of protestors that went to the Capitol from Mr. Trump's rally, Mr. Keen and thousands of others had entered the restricted area on the Lower West Terrace by 1:14 p.m. (PSR ¶22). Metropolitan Police Department and United States Capitol Police Officers had formed a line behind bike rack barricades to try and prevent the crowd from further entering the area. *Id*. While on the Lower West Terrace near the picket line, Mr. Keen threw water from a plastic bottle, and then the bottle itself, at officers on the line. (PSR ¶23); *see also* Def.'s Ex. A. Moments later, other persons pulled a bike rack away from the police and to the ground, and MPD Officer J.C. moved forward to try to pull it back into place. (PSR ¶23); *see also* Def.'s Ex. B. While Officer J.C. was doing so, Mr. Keen moved forward and shoved the officer with both hands, and then backed away as other officers moved forward. *Id*. After backing further into the crowd, Mr. Keen picked up a metal travel mug and threw it into the police line, where it struck a plexiglass riot shield held by an officer. (PSR ¶24); *see also* Def.'s Ex. C.

Mr. Keen eventually made his way into the Capitol with the crowd at around 2:38 p.m. (PSR ¶25). He then traveled up a staircase to the Rotunda, where he smoked a marijuana joint. *Id*. He moved from the Rotunda toward the Senate chamber at some point, before going back to the Rotunda. *Id*. He left the east Rotunda door at around 3:15 p.m., as officers were physically

3

pushing the crowd out of the building. (PSR ¶26). He was inside the Capitol without permission for about 37 minutes in total. *Id*. After word passed through the crowd that former President Trump was telling everyone to go home, Mr. Keen started making his way back to his car. He stopped for a while near the inauguration site, and saw the National Guard begin to arrive, and then left the city again in his car. Mr. Keen was later located by law enforcement officers based on the Capitol surveillance footage and information provided by a cousin with whom he had stayed on the way to Washington D.C.

Having entered into a plea agreement with the government and entered a guilty plea in this case, the only remaining issue is what sentence is "sufficient, but not greater than necessary" for Mr. Keen under the factors of 18 U.S.C. § 3553(a). He is a thirty-six-year-old electrician, former pizza delivery driver, fast food worker, grain truck unloader, houseman at an event site, dishwasher, and scrapper. (PSR ¶¶55, 75–79). Except for two years when he lived in Indiana, he is a life-long resident of Illinois, and was raised by his mother and stepfather after his biological father died in an alcohol-fueled car accident when Mr. Keen was a child. (PSR ¶¶55, 57). Even after his mother and stepfather divorced, Mr. Keen remains close to his stepfather, who is a retired deputy sheriff and has traveled with Mr. Keen to court appearances and remains a fixture in his life. (PSR ¶57).

Additionally, although Mr. Keen describes his childhood as "alright," he also noted that he "had to grow up fast," because he was in the middle of the arguments between his mother and stepfather prior to their divorce. (PSR ¶59). He witnessed yelling and screaming, and his mother slapped his stepfather in front of Mr. Keen on several occasions. *Id*. However, he never experienced any physical abuse himself, and was able to participate in sports and skateboarding as a child. *Id*. Mr. Keen experimented with alcohol, marijuana, pills, and whippets during high

school, but only drank occasionally and limited his marijuana use to weekends. (PSR ¶68).  He graduated from high school, tried college courses before realizing it "wasn't for him," and then pursued two years of vocational training as an electrician to earn his journeyman accreditation. (PSR ¶71).  He enjoys his work as an electrician and is grateful for the opportunities his current employer is providing for him in the field. (PSR ¶74).

Mr. Keen is in good physical health, apart from being asthmatic. (PSR ¶¶65–66).  He has never been diagnosed with a mental health condition, nor sought out professional assistance for his mental state. (PSR ¶67).  He has no juvenile or adult criminal convictions in his past, and successfully completed a year of supervision for a speeding offense in 2013. (PSR ¶¶43–44, 46).  He has a pending driving under the influence charge from February 14, 2023, with trial currently scheduled for July of this year. (PSR ¶52).  Clearly, the offense in this case is the most significant crime Mr. Keen has committed in his life.

But it does not necessarily follow that Mr. Keen needs to be imprisoned for his actions on January 6, 2021.  As noted above, Mr. Keen appears to have been influenced to travel to Washington D.C. by an article on the InfoWars website, along with the former President and his supporters' claims that the election was stolen and fraudulent, and Mr. Keen believed he was supporting the former President.  He got enmeshed in the throng of people, entered the Capitol grounds with it, and got involved in the skirmish on the impromptu picket line with law enforcement officers before then entering the Capitol rotunda itself.  He laments shoving Officer J.C., regrets throwing his water and the travel mug into the police line and is sorry he went onto the grounds and into the Capitol itself in the first place given what transpired and what has come to light since.  He was caught up in the crowd that day and is grateful he did not hurt anyone through his actions.  He accepts responsibility for his offense and has strived to demonstrate

5

through his conduct on pretrial release that his offense conduct was an aberration in his life, and not indicative of more nefarious intent.

Indeed, Mr. Keen has complied with his conditions of release for over a year now. (PSR ¶14). He has obtained stable employment in his field of expertise and resided initially with his stepfather and more recently with his mother. (PSR ¶¶62, 74). He has passed his supervision drug tests and is maintaining a slightly positive monthly cash flow. (PSR ¶¶70, 80). Mr. Keen is living a modest life, working and taking care of his cat, and striving to build a better future for himself. He has demonstrated that he can be successfully supervised and work with federal probation officers. He has been open about his circumstances with his parents and his employer. All of these factors suggest that Mr. Keen does not pose a danger to the community that requires he be incarcerated in order to protect the community from him in the future, unlike some of the other participants in the illegalities of January 6, 2021, that may have the same advisory sentencing guideline range. *See Gall v. United States*, 552 U.S. 38, 55–56 (2007) (approving the district court's consideration of not only unwarranted disparities, but also unwarranted similarities among offenders who were not similarly situated).

Relatedly, the felony level offense of conviction is itself a significant punishment for someone like Mr. Keen. It is to his credit that he has been able to obtain his current job by being open about his conviction and the possible consequences that stem from it. He will lose important civil rights and continue to have to deal with the stigma associated with his felony offense for the rest of his life. He is still a young man, and his actions on January 6, 2021, have made his life more challenging going forward. He has agreed to pay restitution in the amount of $2,000 to the Architect of the Capitol as part of his plea agreement to account for his actions, which is an additional financial hardship he accepts for his offense. (PSR ¶¶28, 113). He

understands and accepts the reality that his offense brings significant collateral consequences with it that make his life harder and has already taken on that challenge through his compliance and efforts while on release in this case.

The Court has a plethora of sentencing options available in this case, from imprisonment through probation.  Although the advisory sentencing guidelines recommend a sentence of imprisonment, the guidelines largely do not attempt to quantify or account for Mr. Keen's personal history and characteristics, or his conduct while on release throughout this case.  The Court must instead consider these factors under 18 U.S.C. § 3553(a) in the overall sentencing calculus of the case.  Mr. Keen does not need to be punitively incarcerated for the length of time suggested by the advisory sentencing guidelines in this case, and the Court can impose a below-guideline probationary sentence that fulfills the statutory sentencing goals while also accounting for Mr. Keen's individual circumstances and characteristics. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").  The Court has wide discretion to fashion an appropriate sentence for Mr. Keen that takes into account both the offense conduct, and his positive trajectory.  If the Court adopts a probationary sentence, it can further tailor the terms of supervision to both benefit Mr. Keen's rehabilitative progress while ensuring adequate monitoring and supervision in a more punitive form than straight supervision alone.  Such conditions can even include intermittent confinement, community corrections, or home detention if the Court wishes to further restrict Mr. Keen's freedom while still permitting him to work and pursue other correctional and rehabilitative treatment conditions. *See* 18 U.S.C. § 3563(b) (available discretionary conditions

of probation).  The threat of a full resentencing looms if Mr. Keen would violate the faith a probationary sentence shows in him and his progress.

Ultimately, Mr. Keen respectfully argues that the advisory sentencing guidelines recommend a sentence that is greater than necessary and asserts that a sentence to a term of probation would be sufficient in this case.  He urges the Court to consider his conduct and the progress he has made in his life over the past year during his case, and fashion an appropriate probationary sentence that will allow him to continue on his current path.  Such a sentence will be a "just" one that meets the sentencing goals of 18 U.S.C. § 3553(a), which will also be the most beneficial for Mr. Keen and society going forward.

WHEREFORE, for all the reasons discussed herein and noted in the record, Mr. Keen respectfully argues that a sentence below the advisory range, to a term of probation, is sufficient to fulfill the statutory commands of 18 U.S.C. § 3553(a) and asks that the Court impose such a sentence.

Respectfully Submitted,

 */s/ Joseph D. Herrold*
Joseph D. Herrold, Assistant Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610  FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2024, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

 */s/ Morgan Conn*, Paralegal